UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAMELA J. BANKER,

Plaintiff,                    DECISION AND ORDER

-v-                                   09-CV-6652 CJS

COUNTY OF LIVINGSTON, et al.,

Defendants.

INTRODUCTION

Plaintiff alleges that she was sexually abused by a counselor while undergoing court-ordered alcohol treatment and counseling.  The Complaint (Docket No. [#1]) purports to assert tort claims under New York State law and constitutional claims under 42 U.S.C. § 1983.  Now before the Court are the following applications: 1) a motion [#8] to dismiss by Livingston County and Livingston County Probation ("the County"); 2) a motion [#10] for judgment on the pleadings by Livingston County Council on Alcohol and Substance Abuse ("LCCASA"); and 3) a cross-motion [#15] by Plaintiff for attorney's fees incurred in responding to Defendants' motions.  For the reasons that follow, Defendants' applications are granted and Plaintiff's cross-motion is denied.

BACKGROUND

Unless otherwise noted the following facts are taken from the Complaint and are presumed to be true for purposes of this motion.  In 2000, Plaintiff was convicted of DWI, and as part of her sentence of probation, she was required to obtain outpatient treatment and counseling through defendant LCCASA.  LCCASA is a non-profit organization which provided alcohol treatment services.  Plaintiff was assigned to work with defendant John

Hanglow ("Hanglow"), who was a treatment counselor employed by LCCASA.   As a condition of her probation, Plaintiff was required to attend counseling sessions at LCCASA for a period of years, ending in 2004.[1] *See*, Complaint ¶ 57 ("Hanglow remained Pamela's treatment counselor until 2004[.]").   During that period, Hanglow repeatedly raped Plaintiff and coerced her into having sex with him by telling her that he had the power to cause her to be sent to prison.   Sometime in 2004,[2] Hanglow's employment with LCCASA ended, and he became Director of Treatment Court for Livingston County, a position which he held at least through 2008. Complaint ¶ 42.   As Director of Treatment Court, Hanglow was an employee of the New York State Office of Court Administration ("OCA"). *Id*. at ¶ 5.  Hanglow was never employed by the County.

In 2007, Plaintiff was again convicted of DWI.   As part of her sentence, Plaintiff was again placed on probation and directed to participate in alcohol counseling and Treatment Court.   As noted earlier, at this time Hanglow was Director of Treatment Court.   Hanglow continued to sexually abuse Plaintiff and to threaten her by telling her that he could have her sent to prison.   The last time that Hanglow had sexual contact with Plaintiff was in September 2007. Complaint ¶ 46.   After that, Hanglow periodically renewed his threats to have her sent to prison if she told anyone about his misconduct. *Id*. at ¶ ¶ 47-47-50.

On or about October 23, 2008, Plaintiff's Probation Officer, Colleen Fronk ("Fronk"), conducted a random compliance check and determined that Plaintiff had used alcohol.

---

[1]Plaintiff was again convicted of DWI in 2002, and as part of her sentence she was required to continue substance abuse therapy. Complaint ¶ 27.

[2]According to LCCASA's Answer in this action, Hanglow's employment with LCCASA ended on January 28, 2004. Answer [#4] at ¶ 5.

Complaint ¶ 51.  At that time, Plaintiff told Fronk that Hanglow "had been raping her for years." Complaint ¶ 52.  According to the Complaint, October 23, 2008 is the first time that Plaintiff told anyone connected with any of the defendants in this action that Hanglow was abusing her.[3]

On October 31, 2008, Plaintiff was arrested for violating the terms of her probation, based on Fronk's determination that she had used alcohol. *Id*. at 51.  From this date onward, it does not appear that Plaintiff had any further contact with Hanglow in connection with his position as Director of Treatment Court. *See*, Complaint ¶ 58 ("Hanglow continued as Pamela's Drug Treatment Coordinator up to the time of her VOP arrest on October 31, 2008.").  On or about November 10, 2008, Plaintiff pled guilty to violating her probation. *Id*. at ¶ 63.

Moreover, in November 2008, a Livingston County Sheriff's Investigator, Kim Moran ("Moran"), interviewed Plaintiff, "specifically for the purpose of gathering information on the allegations made concerning Hanglow's treatment of Pamela." Complaint ¶ 64.  Plaintiff further maintains that in November 2008, her boyfriend, Tom Budreau ("Budreau"), told Moran that he had talked with another female probationer in Treatment Court, "Kit," who told him that Hanglow had refused to help her because she would not have sex with him. *Id*. at ¶ 66.  Kit purportedly told Budreau that she had reported Hanglow's behavior to "counselors at LCCASA." *Id*.  The Complaint does not indicate when the alleged incident between Kit and Hanglow occurred, or when she allegedly complained to LCCASA.  There is no indication that "Kit" complained to the County.

---

[3]Plaintiff alleges that prior to that she had told her daughter that Hanglow was raping her, and her daughter subsequently told her father. Complaint ¶ ¶ 39, 48.

Plaintiff also alleges that another female probationer, Debbie Mease ("Mease"), complained to unspecified "authorities" that Hanglow had made unwanted sexual advances toward her. Complaint ¶ 68. The Complaint does not indicate when Mease allegedly notified "authorities,"[4] nor does it indicate that the County was notified. Additionally, the Complaint states, upon information and belief, that Livingston County and Livingston County Probation received "several substantiated allegations of sexual misconduct against Hanglow." Complaint ¶ 62. This last allegation, however, again fails to specify a time frame or to whom the allegations were made.

On January 20, 2009, an investigator with OCA's Inspector General's Office, Elizabeth Candreva ("Candreva"), interviewed Plaintiff "for over two hours" concerning her allegations against Hanglow. Complaint ¶ 69. Subsequently, Hanglow "either was fired or asked to resign or retire involuntarily." *Id*. at ¶ 74.

On April 7, 2009 Plaintiff was released from jail and restored to probation. Complaint ¶ 70. As a condition of her probation, Plaintiff was required to receive the medication Antabuse, a drug used to treat chronic alcoholism, three times per week. *Id*. ¶ 72. Plaintiff maintains that in order to receive this medication, defendant Livingston County Probation "required [her] to visit the male area of the jail - unescorted - to receive her mandated medication of Antabuse, invariably subjecting her to cat-calls and explicit vulgarities from the male jail population," which caused her to experience "great anxiety." *Id*. ¶ 72. Plaintiff's doctor contacted the sentencing judge, and indicated that Plaintiff's "visits to the male area of the jail subject her to rude behavior by the inmates and contributes to a continuation of

---

[4] The Complaint states that Mease was in Treatment Court "at the same time as [Plaintiff]," but Plaintiff was in Treatment Court for a period of years.

4

her traumatic symptoms from past abuse." *Id*. ¶ 73.  The sentencing judge responded by permitting Plaintiff to receive her Antabuse treatments at the office of her primary care physician. *Id*.

On June 26, 2009, Plaintiff filed a Notice of Claim [#8-2] against Livingston County and Livingston County Probation pursuant to New York General Municipal Law § 50-e. Complaint ¶ 7.  The Notice of Claim generally recited the matters described above, except that it did not refer to Plaintiff having to receive Antabuse at the jail.

On December 18, 2009, Plaintiff commenced this action.  The Complaint purports to state six causes of action: 1) assault and battery; 2) false imprisonment; 3) negligent hiring, training, and supervision; 4) intentional infliction of emotional distress ("IIED"); 5) negligent infliction of emotional distress ("NIED"); and 6) a claim under 42 U.S.C. § 1983 for violation of Plaintiff's rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.  The Complaint does not specify which of the causes of action are being asserted against the separate defendants.

Livingston County and Livingston County Probation subsequently filed the instant motion [#8] to dismiss the Complaint pursuant to Fed.R.Civ. P. 12(b)(6), on the following grounds: 1) the Section 1983 cause of action fails to state a claim because it does not allege that Hanglow acted pursuant to a county policy or custom; 2) the Section 1983 claims arising prior to December 18, 2006 are barred by the applicable three-year statute of limitations; 3) all state-law claims arising prior to September 19, 2008, are time-barred by the applicable statute of limitations found in General Municipal Law § 50-1(1)(C), which is one year and ninety days; 4) the County is not liable for Hanglow's actions during the period that he was Director of Treatment Court, since he was an employee of New York State OCA; 5) any

5

claims against the County arising from Hanglow's employment with LCCASA are time-barred; 6) any state law claims involving Plaintiff's probation supervision in 2009 (having to take Antabuse at the jail) were not included in the notice of claim; 7) any state-law claims arising prior to March 25, 2009 are barred because Plaintiff did not file a timely notice of claim; 8) the Complaint does not state a claim for IIED; 9) the Complaint does not state a claim for NIED; and 10) the County is immune from the state law claims because the complained-of conduct related to discretionary determinations by public employees.

LCCASA then filed the subject motion for judgment on the pleadings, primarily on the basis that the claims against it are time-barred.   Additionally, LCCASA contends that it cannot be liable under Section 1983 because it is not a "government entity."   Further, LCCASA adopts the arguments raised by Livingston County and Livingston County insofar as they pertain to LCCASA.

Plaintiff opposes Defendants' motions, and maintains that: 1) the Complaint pleads a municipal policy or custom; 2) the civil rights claims are not time-barred because there was an "ongoing violation"; 3) the state-law claims are not time barred because there was a continuous "pattern of systemic violations"; 4) Livingston County is liable for Hanglow's actions, even though he was an employee of OCA; 5) the claims against LCCASA are not time-barred, because there was a continuing "pattern of systemic violations"; 6) Plaintiff may pursue the municipal claims arising in April 2009, even though they were not included in the Notice of Claim; 7) municipal claims occurring more than ninety days prior to the filing of the Notice of Claim are still timely, because there was an ongoing violation; 8) the Complaint

states a claim for IIED against Hanglow[5] and LCCASA; 9) the Complaint states a claim for

NIED; 10) the municipal defendants are not entitled to qualified immunity;[6] and 11) LCCASA

should be deemed a state actor for purposes of Section 1983.   Additionally, Plaintiff

demands an award of attorney's fees incurred in responding to Defendants' motions.

On March 31, 2011, counsel for the moving parties appeared before the undersigned

for oral argument.   At that time, Plaintiff's counsel clarified, *inter alia*, that the municipal

liability claims under Section 1983 against Livingston County and Livingston County

Probation are based on the County's failure to train and supervise Hanglow.[7]

DISCUSSION

The applicable legal standard for determining whether a complaint is sufficient to

survive a Rule 12(b)(6) motion is clear:

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain
> statement of the claim showing that the pleader is entitled to relief, in order to
> give the defendant fair notice of what the claim is and the grounds upon which
> it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does
> not need detailed factual allegations, a plaintiff's obligation to provide the
> grounds of his entitlement to relief requires more than labels and conclusions,
> and a formulaic recitation of the elements of a cause of action will not do.
> Factual allegations must be enough to raise a right to relief above the
> speculative level, on the assumption that all the allegations in the complaint
> are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964-65 (2007); *see also*,

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive

---

[5]Hanglow is not one of the moving defendants.

[6]Plaintiff apparently misunderstood that the municipal defendants were moving to dismiss on the basis of qualified immunity, which they are not.

[7]*See also*, Pl. Memo of Law [#15-3] at 10 ("Defendants failed to ensure adequate and appropriate services which protected female probationers from intimidation, manipulation and sexual misconduct at the hands of substance abuse counselors.").

dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'") (quoting *Bell Atl. Corp. v. Twombly*) (footnote omitted); *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (Indicating that *Bell Atl. Corp. v. Twombly* adopted "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible[,]" as opposed to merely conceivable.), *reversed on other grounds, Ashcroft v. Iqbal*, 129 S.Ct.1937 (2009).   When applying this standard, a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999).  A Plaintiff may satisfy the *Twombly* plausibility standard by pleading facts "upon information and belief," " where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted).  "The same standard applicable to Fed.R.Civ.P. 12(b)(6) motions to dismiss applies to Fed.R.Civ.P. 12(c) motions for judgment on the pleadings." *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010) (citation omitted).

### Claims Under Section 1983

As discussed above, Plaintiff asserts a Section 1983 claim against the County, based on the notion that it had a municipal policy or practice which permitted Hanglow to injure her. She specifically maintains that the policy consisted of a failure to train and supervise

Hanglow.   The relevant legal principles governing actions against a municipality under

Section 1983 are well settled:

> Section 1983 provides, in pertinent part:
>
>> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....
>
> 42 U.S.C. § 1983. In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The fifth element-the "official policy" element-can only be satisfied where a plaintiff proves that a "municipal policy of some nature caused a constitutional tort." *Id*. at 691, 98 S.Ct. 2018. "In other words, a municipality may not be found liable simply because one of its employees committed a tort." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).
>
> The Supreme Court has made clear that "a municipality cannot be made liable" under § 1983 for acts of its employees "by application of the doctrine of respondeat superior." *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 478, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) ( "[G]overnment bodies can act only through some natural persons[; therefore] governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."). "Liability for unauthorized acts is personal; to hold the municipality liable, *Monell* tells us, the agent's actions must implement rather than frustrate the government's policy." *Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir.1992). Therefore, a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the alleged injury. *Brown*, 520 U.S. at 404, 117 S.Ct. 1382.

*Roe v. City of Waterbury*, 542 F.3d 31, 36 -37 (2d Cir. 2008).  In this regard,

[t]he plaintiff may establish the existence of a policy or custom in a variety of ways. Generally speaking, the courts have articulated four circumstances in which a municipality may be held liable for the unconstitutional acts of its employees. The plaintiff may establish (1) a formal policy, officially promulgated or adopted by the municipal defendant, *Monell*, 436 U.S. at 690, or (2) a specific action or decision by an official responsible for establishing final policy with respect to the subject matter, if that action or decision caused the violation of plaintiff's constitutional rights, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986) (plurality opinion), or (3) the existence of an unlawful practice by subordinate officials so permanent and well settled as to constitute a "custom or usage" and proof that this practice was so manifest or widespread as to imply the constructive acquiescence of the policy-making officials, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 130 (1988); *Sorlucco v. New York City Police Dept.*, 971 F.2d 864, 871 (2d Cir. 1992), or (4) the failure of the City to train or supervise its employees in a fashion designed to prevent the violation of plaintiff's rights, if such failure amounts to "deliberate indifference" to the rights of those with whom the municipal employees will come into contact.[8] *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)[.]

*White-Ruiz v. City of New York*, No. 93CIV.7233(DLC)(MHD), 1996 WL 603983 at *7 (S.D.N.Y. Oct. 22, 1996) (citation omitted).  "The mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (citation and internal quotation marks omitted).

Applying these principles, the Complaint fails to plausibly state a municipal liability claim against the County based on a failure to train or supervise,  since the County never

---

[8]"To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious.  An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."*Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (citations omitted); *see also*, *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 128 (2d Cir. 2004) ("The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence.  Thus, plaintiffs' evidence must establish only that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction.") (citations omitted).

employed Hanglow. *See, Bliven v. Hunt*, 478 F.Supp.2d 332, 340 (E.D.N.Y. 2007) ("[B]oth Family Court judges and their court attorneys are not municipal employees; they are State employees.  Defendant does not train or supervise these employees and therefore, cannot be held liable for any alleged failure to train and supervise.").[9]  Nor has Plaintiff otherwise plausibly pleaded that the County had a policy or practice which was the "driving force" behind her alleged constitutional violations involving Hanglow.   Moreover, Plaintiff's allegation that she was required to receive her Antabuse treatments at the jail, as a condition of her probation, until relieved of that obligation by the sentencing judge, does not state a claim of constitutional magnitude against the County.[10]   Additionally, to the extent that Plaintiff is claiming that the County's alleged requirement that she receive her Antabuse treatments at the jail is a continuation of the alleged constitutional violation involving Hanglow, the Court disagrees.  Accordingly, the Section 1983 claims against the County are dismissed.

As for LCCASA, it maintains that it did not act under color of law, and alternatively, that the Section 1983 claims are time-barred by the applicable three-year statute of limitations. Plaintiff responds that LCCASA can be sued as a "state actor" because there was a close nexus between the state and the challenged action. Pl. Memo of Law [#15-3] at 21. Additionally, Plaintiff contends that the claim against LCCASA is timely, under the "continuing violation" theory. *Id*. at 11.  Concerning the timeliness of the action as against LCCASA, under Section 1983,

---

[9]For this same reason, Plaintiff's third cause of action, for the tort of negligent hiring, training, and supervision, fails to state a claim against the County.

[10]Because the Court finds that the Complaint does not state a Section 1983 claim against the County, it does not reach the County's alternative arguments concerning timeliness and notice under the General Municipal Law.

> [w]hen a plaintiff experiences a "continuous practice and policy of discrimination,"
> . . . the commencement of the statute of limitations period may be delayed until
> the last discriminatory act in furtherance of it.   While discrete incidents of
> discrimination that are not related to discriminatory policies or mechanisms may
> not amount to a continuing violation, a continuing violation may be found where
> there is proof of specific ongoing discriminatory polices or practices, or where
> specific and related instances of discrimination are permitted by the employer to
> continue unremedied for so long as to amount to a discriminatory policy or
> practice.   Where a continuing violation can be shown, the plaintiff is entitled to
> bring suit challenging all conduct that was a part of that violation, even conduct
> that occurred outside the limitations period.

*Cornwell v. Robinson*, 23 F.3d 694, 703 -704 (2d Cir. 1994) (citations omitted).   Here, even

assuming *arguendo* that LCCASA can be sued under Section 1983 for having acted under

color of state law, the "continuing violation" doctrine does not prevent the claims against

LCCASA from being time-barred.   LCCASA did not employ Hanglow after 2004, and the Court

finds that Plaintiff's Section 1983 claim against LCCASA accrued, at the latest, when Hanglow's

employment with LCCASA ended.[11]   Since it is evident from the Complaint that Plaintiff

commenced this action more than three years after Hanglow's employment with LCCASA

ended, the Section 1983 claims against LCCASA are time-barred.   Accordingly, the Section

1983 claims against LCCASA are dismissed.

### State Tort Claims

At the outset, the Court finds that the County is not  vicariously liable for Hanglow's

alleged torts.   The County contends that it is not liable for Hanglow's actions, since he was not

a county employee.[12]   Plaintiff responds that the County should be held liable for Hanglow's

---

[11]Plaintiff maintains that "the final violation in a series of ongoing and *related* violations to Plaintiff's rights occurred in 2009 when Plaintiff's primary physician was not allowed to administer mandated Antabuse." Pl. Memo of Law [#15-3] at 11 (emphasis added).   The Court disagrees that the allegations concerning Plaintiff's Antabuse treatments are related to the alleged abuse by Hanglow, or that they state a constitutional violation or tort.

[12]*See*, County Memo of Law [#8-3] at 10 ("The Complaint attempts to hold the County and Probation liable for Hanglow's actions based upon Probation's alleged obligation to supervise Banker to ensure satisfaction of the court-ordered conditions of the release, including her participation in the court-ordered

acts, because it did not "object" to Hanglow moving from his job at LCCASA to his job with OCA. Pl. Memo of Law [#15-3] at 13. From this, Plaintiff apparently assumes, although she has not plausibly pleaded, that the County was aware of allegations of abuse against Hanglow in 2004 when he moved from LCCASA to OCA, which it failed to pass on to OCA. Additionally, Plaintiff contends that the County is liable for Hanglow's acts, because it "required [women such as Plaintiff] to participate in [Hanglow's] program as a condition of their probation." *Id*. On this point, though, it was the sentencing judge, and not the County, who required Plaintiff to participate in Drug Treatment Court. See, Complaint ¶ ¶ 27, 44. Further, Plaintiff states that there was a "significant nexus" between "Hanglow's abusive behavior and the state action," based on the alleged complaints by "numerous women," and therefore there is an issue as to whether the County owed a duty to Plaintiff. *Id*. However, Plaintiff has not pleaded any agency relationship between the County and Hanglow, nor is the Court aware of any authority to impose vicarious liability on a municipality based on a "nexus."

As for whether the County breached a duty to protect Plaintiff from a third-party, *i.e.* Hanglow, in connection with the operation of the Probation Department, the law in New York is that,

> an agency of government is not liable for the negligent performance of a governmental function unless there existed a special duty to the injured person, in contrast to a general duty owed to the public. Such a duty, we have explained- a duty to exercise reasonable care toward the plaintiff- is born of a special relationship between the plaintiff and the governmental entity.
> [Such a] special relationship can be formed in three ways: (1) when the municipality violates a statutory duty enacted for the benefit of a particular class of persons; (2) when it voluntarily assumes a duty that generates justifiable

---

substance abuse program. In other words, Plaintiff alleges that by virtue of Probation's alleged obligation to ensure that Plaintiff was compliant with a Court order that she participate in a drug treatment program, Probation assumed responsibility for the actions of a State employee, i.e., Hanglow. Plaintiff's logic is obviously flawed. Probation's only alleged supervisory role was to make certain that Plaintiff participated in a program, not that a New York State employee would not commit rape.").

> reliance by the person who benefits from the duty; or (3) when the municipality
> assumes positive direction and control in the face of a known, blatant and
> dangerous safety violation.

*McLean v. City of New York*, 12 N.Y.3d 194, 199, 905 N.E.2d 1167, 1171 (2009) (citations and internal quotation marks omitted).  Plaintiff does not allege that her case falls within any of these three situations, nor does the Complaint raise any such reasonable inference.

The Complaint also fails to state a direct claim against the County for the intentional torts of assault, battery, false imprisonment, negligent hiring, or  IIED.  In that regard, the Complaint does not allege that any County employee committed any of those torts against Plaintiff.  As for the NIED claim, the Complaint alleges that the County committed the tort by "requiring her" to "walk unescorted through portions of [the] male population jail," to receive her Antabuse treatments, which caused her to experience anxiety.[13]  Such allegations do not rise to the level necessary to establish negligent infliction of emotional distress.  On this point,

> [a] cause of action for negligent infliction of emotional distress, which no longer
> requires physical injury as a necessary element, generally must be premised
> upon the breach of a duty owed to plaintiff which either unreasonably endangers
> the plaintiff's physical safety, or causes the plaintiff to fear for his or her own
> safety.

*Bernstein v. East 51st Street Development Co., LLC* , 78 A.D.3d 590, 591, 914 N.Y.S.2d 3, 4 (1st Dept. 2010) (citation omitted).   Furthermore, the defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

---

[13] *See also*, Pl. Memo of Law [#15-3] at 19 ("Even after Plaintiff was identified as a rape victim, the County Defendants showed little regard for her physical safety or mental health by ordering her to travel unescorted through the male section of the jail in order to obtain Antabuse.").  Whether or not Plaintiff was a rape victim was under investigation at the time.  What was certain at the time was that Plaintiff was a convict, having been convicted of DWI numerous times, who was present at the jail to receive court-ordered medical treatment as part of her probation sentence.  There is no indication that Plaintiff's physical safety was in danger.

*Burger v. Singh*,  79 A.D.3d 1086, 1088, 915 N.Y.S.2d 113, 115 (2d Dept. 2010) (citations omitted); *see also, Lau v. S & M Enterprises*, 72 A.D.3d 497, 498, 898 N.Y.S.2d 42, 43 (1st Dept. 2010) ("The existence of extreme and outrageous conduct is also a necessary element for a claim of negligent infliction of emotional distress."). Here, the County's alleged conduct was not outrageous, and there is no indication that Plaintiff's physical safety was threatened.[14] *See, Tornheim v. Federal Home Loan Mortg. Corp.*, 988 F.Supp. 279, 286 (S.D.N.Y. 1997) (Plaintiffs did not state claim for NEID "because they were never in a situation involving any likelihood of imminent physical harm."). Consequently, the NIED claim against the County is also dismissed for failure to state a claim.[15]

As for the tort claims against LCCASA, it is undisputed that the limitations period for the intentional torts is one year, and that the limitations period for the NEID claim is three years. LCCASA contends that these limitations periods expired prior to Plaintiff commencing this action in 2009, since Hanglow had not worked for the company since 2004. Plaintiff responds that the tort claims are timely, because there was a "continuing violation." Pl. Memo of Law [#15-3] at 14. In support of this argument, Plaintiff alleges that LCCASA "took no action against Defendant Hanglow," and "showed deliberate indifference to the *quid pro quo* sexual demands made upon other probationers." *Id*. at 14. In this regard,

> [t]he continuing wrong doctrine provides that, in certain cases involving continuous or repeated wrongs, the statute of limitations accrues upon the date of the last wrongful act. However, the doctrine may only be predicated

---

[14]*See*, Complaint ¶ ¶ 72-74 (referring to "vulgar" and "rude" comments).

[15]Since the Court finds that the allegations fail to state a claim, it does not reach the County's alternative argument concerning the timeliness of the claims and the adequacy of the Notice of Claim under the General Municipal Law.

15

on continuing unlawful [wrongs] and not on the continuing effects of earlier [wrong]ful conduct.

*Margrabe v. Sexter & Warmflash, P.C.*, No. 07-CV-2798 (KMK)(GAY), 2009 WL 361830 at *7 (S.D.N.Y. Feb. 11, 2009) (citations omitted). In this case, the "continuing wrong" or "continuing violation" doctrine does not apply. The Complaint does not plausibly state that LCCASA committed any tortious act against Plaintiff within the relevant limitations periods, or for that matter, after 2004 when Hanglow left LCCASA's employ. Specifically, Plaintiff has not alleged that LCCASA committed the torts of assault, battery, false imprisonment, negligent hiring, IIED, or NIED, within any relevant limitations period. To the extent that the Complaint purports to allege such torts, it fails to state claims for which relief can be granted. Accordingly, Plaintiff's state tort claims against LCCASA are dismissed as time-barred.

### *Plaintiff's Cross-motion for Attorney's Fees*

Plaintiff contends that she is entitled to attorney's fees incurred in opposing Defendants' motions, pursuant to 28 U.S.C. § 1927. In support of that application, Plaintiff's counsel generally states that, in his opinion, motions under FRCP 12(c) are "an ineffective hybrid" between motions under FRCP 12(b)96) and FRCP 56, and should be avoided. Wicks Declaration [#15-2] at ¶ 2. Additionally, he maintains that the motions are without merit and "premature as discovery is incomplete at best." *Id*. at ¶ 3. However, "[i]t is well established that the imposition of sanctions under § 1927 requires a clear showing of bad faith on the part of an attorney, and that bad faith may be inferred only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Salovaara v. Eckert*, 222 F.3d 19, 35 (2d Cir. 2000) (citations and internal quotation marks omitted). Here, Plaintiff has clearly failed to

demonstrate that Defendants acted in bad faith.  Consequently, Plaintiff's cross-motion is denied.

## CONCLUSION

Defendants' motions [#8][#10] are granted, and the claims against Livingston County, Livingston County Probation, and LCCASA are dismissed.  The Clerk of the Court is directed to terminate Livingston County, Livingston County Probation, and LCCASA, as parties to this action.  Plaintiff's cross-motion [#15] is denied.  Plaintiff's counsel is directed to contact the chambers of the Honorable Jonathan W. Feldman, United States Magistrate Judge, to request a scheduling conference concerning the remaining claims in this action.

SO ORDERED.

Dated:       April 6, 2011
             Rochester, New York

                                         /s/ Charles J. Siragusa
                                         CHARLES J. SIRAGUSA
                                         United States District Judge